UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| JENNIFER GUSTAFSON MURTHA, | ) | |
| (Social Security No. XXX-XX-9714), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:10-cv-61-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 11,

15) and an Order of Reference entered by Chief Judge Richard L. Young on

August 12, 2010 (Docket No. 17).

**I.  Statement of the Case**

Plaintiff, Jennifer Gustafson Murtha, seeks judicial review of the final

decision of the agency, which found her not disabled and, therefore, not entitled

to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI")

under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20

C.F.R. § 404.1520(f).  This court has jurisdiction over this action pursuant to 42

U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on May 7, 2007, alleging disability since December 31, 2005. (R. 119-21, 127-29). The agency denied Plaintiff's application both initially and on reconsideration. (R. 64-81, 83-96). Plaintiff appeared and testified at a hearing before Administrative Law Judge Arline Colon ("ALJ") on April 29, 2009. (R. 24-56). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 24). On May 11, 2009, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 14-23). After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on April 28, 2010, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Plaintiff was 31 years old at the time of the ALJ's decision and had a high school education. (R. 21). Her past relevant work experience included work as a courier (light unskilled). (R. 21).

### B. Medical Evidence

#### 1. Plaintiff's Impairments

In 2001, Plaintiff underwent a fusion surgery at the C5-6 level of her cervical spine. (R. 224, 250).

On September 18, 2006, nine months after her alleged disability onset date, Plaintiff saw a chiropractor who observed that Plaintiff had a positive Patrick test in her left hip and a limited range of motion in portions of her neck and lower back, but a negative straight leg raising test and normal reflexes. (R. 221-24). Plaintiff also completed a pain questionnaire, in which she indicated that her pain was gradually worsening and prevented her from sitting more than one hour. (R. 217-18). However, Plaintiff also reported that she had some pain with walking, but it did not increase with distance; that she had some pain with standing, but it did not increase with time; that she could lift heavy weights, but it gave her extra pain; that she did not need to change her way of washing or dressing in order to avoid pain; that she had some pain with traveling, but none of her usual methods of travel worsened the pain; that her social life was normal, but it increased the degree of her pain; and that she had pain in bed, but it did not prevent her from sleeping well. (R. 217-18). She also indicated that pain did not cause more than "some" (or 50%) interference with any activity, including sitting or performing her job, and that she relied very little on pain medications; she also reported that she did not need to rely on others at all for support with her pain. (R. 217).

In addition, Plaintiff completed a form regarding her neck pain, in which she reported that her neck pain was "fairly severe" at that time and that she had moderate but infrequent headaches. (R. 219). However, Plaintiff also indicated that she could lift heavy weights, but they gave her extra pain; that she could

drive as long as she wanted with moderate neck pain; that she could read as much as she wanted with slight neck pain; that neck pain slightly disturbed her sleep (less than one hour sleepless); that she could engage in all of her recreational activities with some neck pain; that she could look after her personal care without causing extra pain; and that she could do as much work as she wanted to do.  (R. 219).

On February 27, 2007, Plaintiff reported to the Welborn Clinic for a complete physical exam.  (R. 207-08).  Layne Robinson, M.D., found no joint pain or swelling, no weakness, and a normal gait.  (R. 208).  Plaintiff smoked a half a pack of cigarettes a day.  (R. 207).  Plaintiff was not suffering from any fatigue, fever, or night sweats.  (R. 207).  An examination of her back, neck, and extremities was normal.  (R. 208).

On April 9, 2007, Plaintiff visited R. Michelle Galen, M.D., at Welborn Clinic and complained of recent worsening lower back pain for the past three days radiating down her right leg.  (R. 203-04).  Plaintiff had no complaints of myalgias, neck stiffness, or weakness.  (R. 203).  Dr. Galen observed that Plaintiff had tenderness and a muscle spasm at three levels of her lumbar spine, but a negative straight leg raising test and a normal range of motion in all of her joints.  (R. 203).  She diagnosed Plaintiff with an acute backache and prescribed an anti-inflammatory and stretching exercises.  She also offered to X-ray Plaintiff's lower back, but Plaintiff declined due to cost.  (R. 203).  Plaintiff had visited Welborn Clinic merely five days earlier on April 4, 2007, and Dr.

Robinson reported that Plaintiff was in "no apparent distress" and that the record does not even reference back pain. (R. 205-06).

On September 4, 2007, Plaintiff filled out a pre-exam report that indicated she had chronic pain from a herniated disc surgery. (R. 250-53). She indicated that she was a 20-year, pack-a-day smoker. (R. 252). She also reported that she suffered from migraines that affected her vision. (R. 253). Alexander Dela Llana, M.D., her family physician, saw her that day for complaints of chronic intermittent neck pain that occasionally radiated down her left arm; chronic back and hip pain that radiated down her left leg; and occasional migraine headaches. (R. 254-55). Dr. Dela Llana observed that Plaintiff had a reduced range of motion in her neck and lower back, but a negative straight leg raising test and normal motor strength and reflexes. (R. 255). He diagnosed her with chronic neck pain, for which he continued her on anti-inflammatory medications, and migraine headaches, for which he continued her on Fioricet and Midrin. (R. 255).

On September 19, 2007, Plaintiff saw John O. Grimm, M.D., an orthopedic surgeon who had previously performed her cervical fusion surgery, and she primarily complained of severe neck pain that radiated to both of her arms. (R. 264-65). It was noted that Plaintiff stopped working for her family in December 2005 when "the work ran out." (R. 264). Plaintiff reported that she had difficulty walking more than two or three blocks, but it was related to foot problems. (R. 264). Dr. Grimm observed that Plaintiff had some reduced motor

strength and sensation at a few points and tenderness in parts of her lower neck, but a normal gait and reflexes. (R. 264-65). He reviewed an X-ray of Plaintiff's cervical spine (R. 268) and diagnosed her with chronic bilateral cervical radicular syndrome with possible radiculopathy at the C7 level, spondylosis at C4-5, and mild degenerative changes at C6-7; referred her to physical therapy; and prescribed Mobic (an anti-inflammatory). (R. 265).

On September 28, 2007, Plaintiff complained to Dr. Dela Llana of severe headaches, blurred vision, and dizziness. (R. 256-57). Plaintiff reported that these headaches had been severe since a September 9 tick bite for which she went to the hospital; a work-up for tick-borne illnesses was negative. (R. 256). Dr. Dela Llana observed that Plaintiff had a positive Romberg's test (used to detect poor balance), but normal motor strength, sensation, and reflexes. (R. 257). He diagnosed her with possible migraine headaches, but ordered a brain MRI to rule out other conditions. (R. 257).

On October 5, 2007, Plaintiff complained of sudden vertigo and ringing in her ears. (R. 260-61). MRIs of Plaintiff's brain were normal, and Dr. Dela Llana diagnosed her with Meniere's disease (a disorder of the inner ear affecting hearing and balance). (R. 261).

On October 18, 2007, Plaintiff saw Dr. Grimm and complained of continued radiating neck pain, but improved lower back pain. (R. 267). Dr. Grimm observed that Plaintiff had some tenderness in her neck and lower back, but a normal examination. (R. 267). He diagnosed Plaintiff with improving

acute lumbar syndrome with a degenerative disc at the L5-S1 level and maintained his prior diagnosis from September. (R. 267). He referred Plaintiff for a cervical steroid injection, but opined that she needed no formal treatment for her lower back pain. (R. 267). One week later, Plaintiff received an epidural steroid injection in her cervical spine. (R. 269-70).

On November 1, 2007, Plaintiff saw Dr. Dela Llana for a check-up on her Meniere's disease and reported no dizziness, falling, or loss of balance. (R. 288-89). Dr. Dela Llana observed that Plaintiff had no joint pain or swelling, full motor strength, and normal reflexes; he opined that her Meniere's disease had improved. (R. 288).

A December 3, 2007 MRI of Plaintiff's cervical spine showed mild cervical spondylosis at the C4-5 and C6-7 levels without significant foraminal compromise. (R. 274).

On December 5, 2007, Plaintiff had a physical with Dr. Dela Llana who opined that Plaintiff was a "well adult," and her Meniere's disease was "stable." (R. 287).

Plaintiff complained to Dr. Grimm on December 12, 2007, that a steroid injection worsened her neck pain. (R. 271). Dr. Grimm reported that Plaintiff had no significant tenderness in her neck and a normal motor and sensory examination. (R. 271). He diagnosed her with chronic bilateral cervical-referred syndrome, with mild degenerative changes at the C4-5 and C6-7 levels and a solid fusion at the C5-6 level, and prescribed Toradol (an anti-inflammatory). (R.

271).  He indicated that Plaintiff would be moving to Oregon after her upcoming marriage and released her on an as-needed basis; he opined that Plaintiff needed no surgical intervention.  (R. 271).

On March 11, 2008, Plaintiff returned to Dr. Dela Llana and complained of severe and chronic neck pain that occasionally went down to her right shoulder and arm.  (R. 281-82).  She also complained that she had difficulty standing for prolonged periods of time and lifting more than ten pounds, but she denied any grip strength loss.  (R. 281).  Dr. Dela Llana observed that Plaintiff had a decreased range of motion in her neck and decreased grip strength in both hands, but a full range of motion in her shoulders.  (R. 281).  He diagnosed Plaintiff with chronic neck pain, for which he prescribed physical therapy.  (R. 282).  He also observed that Plaintiff had tenderness at 11 of 18 trigger points, and diagnosed her with fibromyalgia that was "stable at this time."  (R. 281-82).

Plaintiff reported to Dr. Dela Llana on April 21, 2008, that her Meniere's disease and headaches were controlled with medication.  (R. 279-80).  She complained of chronic neck pain that occasionally radiated down to her hands, but indicated that it was "stable."  It was noted that Plaintiff was "doing well." (R. 279).  Dr. Dela Llana diagnosed Plaintiff with stable fibromyalgia, for which he recommended continued exercise.  (R. 280).  He also diagnosed her with stable chronic neck pain, for which he did not prescribe any treatment, and stable migraine headaches, for which he continued her on Midrin.  (R. 280).

On June 6, 2008, Plaintiff visited St. Mary's Medical Center complaining of depression, mood swings, and pain throughout her back and shoulders. (R. 275-76). Nurse Practitioner Mary Lindeman, who practiced with Dr. Dela Llana, observed that Plaintiff had pain in her lower back and neck upon touch and range of motion testing. (R. 275). She noted that Plaintiff had previously been diagnosed with possible fibromyalgia, and she opined that Plaintiff had "[c]omplaints of pain in areas that could be related to a myalgia." (R. 275). It was also noted that Plaintiff suffered from hypothyroidism that was currently being corrected. (R. 275). Lindeman prescribed a trial of Lyrica. (R. 276).

On August 13, 2008, Edward Lagunzad, D.O., a family physician, reported that Plaintiff had tenderness at certain points. (R. 316). He diagnosed Plaintiff with fatigue, musculoskeletal pain, and "possible" fibromyalgia, for which he prescribed Cymbalta. (R. 316). He also ordered blood tests. (R. 316).

On September 24, 2008, Plaintiff complained of headaches after she had mold removed from her home one week earlier. (R. 291, 317). She also complained of neck and joint pain. (R. 291). Dr. Lagunzad questioned whether Plaintiff's symptoms had a fungal cause. (R. 317). He ordered blood tests and prescribed Diflucan (used to treat fungal infections). (R. 317).

On November 13, 2008, Plaintiff visited Dr. Lagunzad for a check-up of her thrush; Plaintiff complained of headaches, continued neck pain, and chest wall pain. (R. 290, 318). Dr. Lagunzad observed that Plaintiff had a reduced range of motion in her neck and tenderness at some points. (R. 318). He diagnosed

Plaintiff with chronic fatigue and chronic musculoskeletal pain; reported that "tender points point toward fibromyalgia;" and indicated that her conditions affected unspecified activities of daily living. (R. 318).

Treatment notes from Dr. Lagunzad on February 5, 2009, indicate that Plaintiff's musculoskeletal pain affected her activities of daily living and restricted her from prolonged sitting and standing and repetitive motion, such as painting or sweeping. (R. 320). Dr. Lagunzad further opined that such activities caused increased pain and subsequently required days of recovery. (R. 320). Finally, Dr. Lagunzad opined that Plaintiff would not be able to follow directions due to fatigue and memory problems. (R. 320). He continued to prescribe Diflucan and continued to question whether Plaintiff's symptoms might have a fungal cause. (R. 320).

### 2. State Agency Review

On August 29, 2007, state agency reviewing physician J. Sands, M.D., opined that there was not enough evidence in Plaintiff's file to rate the severity of her impairments. (R. 237). Dr. Sands noted that Plaintiff would not go to a consultative examination at the advice of her attorney. (R. 237).

On November 8, 2007, state agency reviewing physician Fernando Montoya, M.D., opined that Plaintiff could perform light work and frequently balance and stoop; occasionally climb, kneel, crouch, and crawl; and frequently handle with both hands. (R. 238-45). Dr. Montoya based his conclusions on the fact that Plaintiff had a previous cervical fusion surgery, a mild decrease in her

tricep strength in both arms, mild weakness in a portion of both wrists, and a normal gait. (R. 239). On November 14, 2007, state agency reviewing physician M. Dowden, M.D., reviewed the evidence in Plaintiff's file and affirmed Dr. Sands' assessment as written. (R. 246).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is

defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date and that Plaintiff was insured for DIB through September 30, 2010. (R. 16). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had eight impairments that are classified as severe: history of cervical surgeries times two; chronic pain syndrome; bilateral cervical-referred syndrome; mild degenerative disc disease of

the cervical spine; migraine headaches; Meniere's disease; hypothyroidism; and fibromyalgia. (R. 16). The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16). The ALJ determined that Plaintiff's testimony was not fully credible. (R. 19-21). The ALJ then found that Plaintiff retained the RFC for sedentary work, except she had the following limitations: she can be in a sedentary position for 30 minutes but then must be permitted to shift positions for a minute or two (including standing); occasionally push/pull with upper extremities; occasionally climb, balance, kneel, and crouch; frequently stoop; no exposure to extreme cold or humidity; only simple repetitive tasks; and can frequently handle and frequently perform head/neck rotation. (R. 17). The ALJ determined that, based on this RFC, Plaintiff could not perform her past work, but she could still perform a significant number of jobs in the regional economy, including jobs as information clerk; charge account clerk; and video surveillance monitor. (R. 21-22). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 22).

## VI. Issues

Plaintiff has raised three issues. The court notes a fourth issue that was not explicitly raised by Plaintiff. The issues are as follows:

1. Whether remand is necessary for consideration of new evidence.

2. Whether the ALJ improperly addressed Plaintiff's fibromyalgia.

3. Whether the ALJ failed to give proper weight to the various medical opinions.

4. Whether the ALJ's credibility determination is patently wrong.

**Issue 1:     Whether remand is necessary for consideration of new evidence.**

As an initial matter, the court must determine whether remand is necessary for consideration of "new evidence" because Plaintiff, appearing in this case pro se, attached medical records to her brief that were not presented to the ALJ.  A federal court may not consider new evidence in reviewing the ALJ's decision.  *Rasmussen v. Astrue,* 2007 WL 3326524 at *4 (7th Cir. 2007).  However, the court may remand for an ALJ to consider additional evidence, if such evidence is both new and material, and if there has been shown good cause for the failure to incorporate the evidence into the record in a prior proceeding.  42 U.S.C. § 405(g); *Schmidt v. Barnhart,* 395 F.3d 737, 741-42 (7th Cir. 2005).  Evidence is considered "new" if it was not available or in existence at the time of the administrative proceeding.  *Schmidt,* 395 F.3d at 741-42.  The evidence is "material" if there is a reasonable probability that the ALJ would have reached a different conclusion had he considered the evidence, meaning that the evidence must be relevant to plaintiff's condition during the relevant time period under consideration by the ALJ.  *Id.*

In this case, Plaintiff has not explicitly argued in her brief for a remand for consideration of new evidence.  However, the court may not consider this evidence in reviewing the ALJ's decision.  The only action the court could

possibly take is to issue a "sentence six" remand. Here, such a remand is not warranted. First, Plaintiff has made no attempt to demonstrate "good cause" for her failure to provide this medical evidence at her hearing before ALJ Colon. While she appears now pro se, she was represented at the administrative level by an attorney. And, a claimant represented by counsel is presumed to have presented her best case to the ALJ. *Skinner v. Astrue,* 478 F.3d 836, 842 (7th Cir. 2007).

Even if Plaintiff had demonstrated good cause for her failure to present this evidence to the ALJ, remand would still be unnecessary. One piece of evidence that Plaintiff included was a letter indicating that Plaintiff underwent five therapy sessions at Advanced Therapy Innovations. The letter provides no opinions about Plaintiff's condition and, therefore, it would not qualify as material evidence because it would not have likely altered the ALJ's opinion. Additionally, a letter from Dr. Lagunzad from January 2010 was written eight months after the ALJ's decision, included a new diagnosis of stage II breast cancer, and opined that Plaintiff's ability to perform job-related tasks was significantly impeded by Plaintiff's impairments. This letter is not material because it does not purport to relate to the relevant time period before the ALJ's decision. Finally, Plaintiff included a form that Dr. Dela Llana had allegedly filled out in conjunction with an application for food stamps. This form pre-dates the ALJ's decision and, therefore, it does not qualify as new evidence because it was clearly available at the time of the ALJ's decision. Because

Plaintiff has not demonstrated good cause for her failure to provide the attached evidence to the ALJ at her hearing, and because the evidence either is not new or is not material, remand in this instance is unwarranted.

**Issue 2:    Whether the ALJ improperly addressed Plaintiff's fibromyalgia.**

Plaintiff also claims that the ALJ did not treat her diagnosis of fibromyalgia properly.  Plaintiff's argument is without merit.  The objective medical evidence makes no reference to Plaintiff's fibromyalgia until over two years after Plaintiff alleges her disability began.  Nevertheless, the ALJ generously found that Plaintiff's fibromyalgia was a severe impairment.  The ALJ went on to take Plaintiff's fibromyalgia into consideration and limited Plaintiff to an RFC for sedentary work with the ability to shift positions every 30 minutes.  The ALJ also limited Plaintiff to no concentrated exposure to extreme cold and humidity due, in part, to Plaintiff's fibromyalgia.  Plaintiff has failed to indicate the need for any further limitations based on her fibromyalgia.  In fact, the March 2008 diagnosis of fibromyalgia, which is the only actual diagnosis of fibromyalgia based on the requisite number of tender points, indicates that Plaintiff's fibromyalgia was stable.  (R. 282).  A month-and-a-half later, Dr. Dela Llana was still referring to Plaintiff's fibromyalgia as stable, and he prescribed exercise.  (R. 280).  Based on the lack of opinions that Plaintiff's fibromyalgia caused additional limitation, the court concludes that the ALJ's decision concerning Plaintiff's fibromyalgia is supported by substantial evidence.

**Issue 3:    Whether the ALJ failed to give proper weight to the various medical opinions.**

Next, Plaintiff argues that the ALJ failed to give controlling weight to the opinions of her treating physicians, Dr. Lagunzad and Dr. Dela Llana.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they

provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

In this case, as discussed above, the records from Dr. Dela Llana that included opinions that Plaintiff was significantly impaired were not before the ALJ. Therefore, Dr. Dela Llana's opinions clearly were not entitled to controlling weight. All of Dr. Dela Llana's medical records that were presented to the ALJ indicated relatively mild findings. In September 2007, Dr. Dela Llana found a reduced range of motion in Plaintiff's neck and lower back, but a negative straight leg raising test and normal motor strength and reflexes. (R. 255). In November 2007, he observed that Plaintiff had no joint pain or swelling, full

motor strength, and normal reflexes. (R. 288). And, in December 2007, Plaintiff had a physical with Dr. Dela Llana, who opined that Plaintiff was a "well adult," and that her Meniere's disease was "stable." (R. 287). Plaintiff has not directed the court to any objective medical evidence from Dr. Dela Llana that was presented to the ALJ that indicated that Plaintiff had a more debilitating condition than was reflected in the RFC findings made by the ALJ.

As for Dr. Lagunzad's opinions, the records indicate that he opined in February 2009 that musculoskeletal pain affected Plaintiff's activities of daily living and restricted her from prolonged sitting and standing and repetitive motion, such as painting or sweeping; that such activities caused increased pain and subsequently required days of recovery; and that Plaintiff would not be able to follow directions due to fatigue and memory problems.[1] (R. 320). However, these opinions were contradicted by numerous other pieces of medical evidence in the record, and the ALJ was, therefore, free to reject them. First, from January 2006, when Plaintiff alleges her disability first began, to April 4, 2007, there are scant medical records indicating any impairment; especially noteworthy was a February 2007 physical exam that was completely normal. (R. 207-08). Second, as discussed above, Dr. Dela Llana found relatively mild

---

[1]While the court is ultimately concluding below that the ALJ was not obligated to give controlling weight to Dr. Lagunzad's opinions, Plaintiff's assertion that the ALJ completely disregarded Dr. Lagunzad's opinions is not accurate. The ALJ went well beyond the opinions of the state agency physicians who had opined that Plaintiff could perform light work and did partially credit Dr. Lagunzad's findings by limiting Plaintiff to a sit/stand option every 30 minutes to accommodate her difficulties with prolonged sitting or standing and by limiting Plaintiff to simple repetitive tasks to accommodate her alleged problems with concentration.

results during his treatment of Plaintiff from September to December 2007.

Third, Dr. Grimm, who had performed Plaintiff's back surgery in 2001, examined

Plaintiff in October 2007 and found only some tenderness in Plaintiff's neck and

lower back, but it was an otherwise normal exam. (R. 267). Finally, in

November 2007, state agency physicians opined that Plaintiff could perform light

work. Based on the totality of the evidence in the record, the court concludes

that the ALJ's decision not to grant controlling weight to Dr. Lagunzad's opinions

is supported by substantial evidence and must be affirmed.

**Issue 4:** **Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also argues that the ALJ conducted a flawed analysis of her

credibility. An ALJ's credibility determination will not be overturned unless it is

"patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However,

the ALJ's "credibility" decision in this case is not only an analysis of Plaintiff's

credibility, but it is also an evaluation of Plaintiff's complaints of pain.

Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the

Commissioner to assess and report credibility issues, as well as 20 C.F.R. §

404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in

when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or mental impairment(s)--i.e., an
> impairment(s) that can be shown by medically acceptable clinical
> and laboratory diagnostic techniques--that could reasonably be
> expected to produce the individual's pain or other symptoms. The
> finding that an individual's impairment(s) could reasonably be

expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms.  If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.*  This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4).  These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted).  SSR 96-7p further provides that

the ALJ's decision regarding the claimant's credibility "must contain specific

reasons for the finding on credibility, supported by the evidence in the case

record, and must be sufficiently specific to make clear to the individual and to

any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In this case, the ALJ thoroughly examined Plaintiff's credibility and made the following determination:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> The claimant had two cervical spine surgeries after which she returned to work. The claimant then worked for her parents until her alleged onset date in December of 2005. (Ex. 9F 3).

In terms of the claimant's alleged inability to work, the undersigned finds the claimant is not fully credible. Findings upon objective examination simply do not reflect the degree of disability alleged by the claimant. In April of 2007 the claimant had normal flexion, extension, lateral flexion and rotation in the lumbar spine. She had a negative straight leg raise as well as full range of motion of her right hip, knee and foot. (Ex. IF 6). The claimant complained of back pain that radiated into her left leg in September of 2007, yet an examination again revealed a negative straight leg raise. Her motor strength was assessed as 5/5 in all extremities. (Ex. 8F 8-9).

Though she complained of problems gripping and an inability to sit for more than 30 minutes during the hearing, the claimant reported to her neck surgeon in September of 2007 that she did not drop objects and that she did have some lower back pain but that is was not terribly debilitating. Dr. Grimm, the claimant's neck surgeon, noted the claimant had a normal non-ataxic gait as well as 1-2+ reflexes which were symmetric in both her upper and lower extremities. Dr. Grimm recommended the claimant pursue physical therapy for her neck pain. Dr. Grimm noted the claimant's lower back pain showed improvement and did not require formal treatment. (Ex. 9F pp. 3, 5, 9). It is noted by the undersigned that the claimant testified she only went to three out of the eight physical therapy sessions she was allotted because she felt it was not helping her. (Hearing Testimony).

An x-ray of the claimant's cervical spine later revealed a solid cervical fusion with mild degenerative disc disease of the cervical spine. (Ex. 9F 5; 10F 4).

Most telling in the objective evidence concerning the claimant's back pain is an intake form filled out by the claimant for her chiropractor in September of 2006, a full nine months after her alleged onset date. In this form the claimant indicates the following: she does not have to change her way of washing or dressing in order to avoid pain; she has some pain on walking but it does not increase with distance; she has some pain on standing but it does not increase with time; she gets pain in bed but it does not prevent her from sleeping well; she gets some pain while traveling, but none of her usual forms of travel make it any worse; the claimant can look after herself without causing extra pain; she is able to lift heavy weights but it gives her extra pain; she is able to read as much as she wants with a slight pain in her neck; she has moderate headaches which come infrequently; she can concentrate fully when she wants to with

slight difficulty; <u>she is able to do as much work as she wants to</u>; she can drive as long as she wants with moderate pain in her neck; her sleep is <u>slightly</u> disturbed (less than 1 hr. sleepless); and she is able to engage in all of her recreation activities with some pain in her neck. (Ex. 2F pp. 8, 9). Such admissions are decidedly different from the claimant's testimony during her hearing that she has not slept well in the past eight years, cannot drive for long distances by herself, cannot lift more than 10 pounds, cannot lift her arms to wash her hair and must sit in a recliner with her feet elevated or lie down to relieve her pain.

As for the claimant's migraines, she testified she has migraines at least three times per month which can last a few days. (Hearing Testimony). The record indicates an MRI of the claimant's head was negative and that her migraines were controlled with Midrin p.r.n. (Ex. 8F 14; 11F 5). The claimant testified she is no longer able to take this medication due to interaction with her other medications. However, she also testified that Excedrin Migraine relieves her symptoms. (Hearing Testimony). The undersigned questions the alleged debilitating severity of headaches that can be controlled with over-the-counter medication.

The undersigned notes that while the claimant testified she struggles with dizziness, her Meniere disease is reportedly better with diuretic treatment. (Ex. 11F 12). The undersigned also notes the claimant has 11/18 fibromyalgia trigger points and physical therapy was recommended to treat this. (Ex. 11F 7). Again, the claimant has only attended three physical therapy sessions after being told it would benefit both her neck pain and her fibromyalgia.

The claimant's activities of daily living also do not comport with a finding of total disability. The claimant is able to drive, watch television and movies, dust, do laundry, clean, shop with her son or husband, read, travel from Kentucky to South Carolina by car, visit with friends and attend church and Bible study. (Hearing Testimony).

(R. 19-20). The ALJ, therefore, went through all of the factors listed in Section

404.1529 and concluded that Plaintiff was not fully credible. The ALJ

reasonably noted that Plaintiff's activities of daily living did not indicate

debilitating pain. The ALJ also explained that medications had been effective in

controlling Plaintiff's dizziness and migraine headaches; in fact, records from April 2008 (nearly two-and-a-half years after Plaintiff's alleged onset date) indicate that her headaches and Meniere's disease were controlled and her fibromyalgia was stable. (R. 279-80). And, the record indicates that from Plaintiff's alleged onset date forward, she engaged in relatively conservative treatment. Finally, the ALJ rightly noted that Plaintiff's allegations do not comport with other evidence in the record. For instance, Plaintiff indicated that her disability began in December 2005. Yet, she told Dr. Grimm that she quit working in December 2005 because "the work ran out." (R. 264). This assessment of Plaintiff's credibility was certainly not patently wrong.

## VII. Conclusion

The ALJ's decision is supported by substantial evidence. Remand is not necessary. Additionally, the ALJ conducted an adequate assessment of Plaintiff's fibromyalgia. The ALJ was also not obligated to grant controlling weight to the opinions of Dr. Dela Llana and Dr. Lagunzad. Finally, the ALJ's credibility determination was not patently wrong. The decision of the Commissioner of the Social Security Administration is **AFFIRMED.**

**SO ORDERED** this 17th day of February, 2011.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Copies to:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

JENNIFER GUSTAFSON MURTHA
1308 Thompson Ave
Evansville, IN  47715